**UNITED STATES of America**

v.

**John RUSSOTTI, Defendant.**

**No. 91 Cr. 799 (PKL).**

United States District Court,
S.D. New York.

Dec. 2, 1991.

Corbin, Silberman & Sanseverino, New York City (Marc J. Gottridge, of counsel), for defendant.

## ORDER AND OPINION

LEISURE, District Judge:

Defendant John Russotti ("Russotti") has moved this Court to dismiss a one-count Information in which the United States of America (the "Government") charges Russotti with violating 18 U.S.C. § 2314 and § 2. For the reasons stated below, Russotti's motion is denied.

### Background

The facts relevant to this motion are not in dispute.[1] In September 1990, Russotti requested that accounts payable personnel at his former employer, The Home Insurance Company ("Home Insurance"), issue a check for $837.30 (the "$837.30 check"), payable to the order of Reynolds, Rappaport & Kaplan ("RR & K"). RR & K is a Massachusetts law firm to which Home Insurance owed no debt. As a result of Russotti's request, the $837.30 check was signed by two employees of Home Insurance who were authorized to sign such checks, and was delivered to Russotti. The signatures on the $837.30 check were genuine, and the check contained no forged signatures. Russotti caused the check to be transported from New York to RR & K in Massachusetts. RR & K received the $837.30 check and deposited it by October 15, 1990.

The $837.30 check was one of five checks, totalling $125,904.71, that Russotti admits causing Home Insurance to issue between September 1990 and November 1990 to payees who were not entitled to such payments. The other four checks were all made payable to an entity in whose name Russotti had opened a bank

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Benjamin E. Rosenberg, of counsel), for U.S.

---

**1.** In addition, it is well established that, for purposes of this motion to dismiss the Information, the facts alleged in the Information are taken as true. *See, e.g., Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952); *United States v. Pacione,* 738 F.2d 567, 568 (2d Cir. 1984). The Information charges that Russotti "falsely caused a check in the amount of approximately $837.30 to be written by Home Insurance Company and made out to Reynolds, Rappaport & Kaplan, and caused that check to be transported in interstate commerce."

account in New York. The government does not allege that Russotti violated any federal law either by causing these four checks to be issued or by transporting them, entirely within New York. Russotti has since, through counsel, tendered full restitution of $125,904.71 to Home Insurance.

The Information charges Russotti with violating 18 U.S.C. § 2314, which provides in part that:

> Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Under 18 U.S.C. § 2311, the term "securities," as used in 18 U.S.C. § 2314, includes "any ... check." The Government's theory of the case against Russotti is that he violated 18 U.S.C. § 2314 by causing a "falsely made" security—the $837.30 check, made payable to RR & K, which was a false payee—to be transported in interstate commerce, from New York to Massachusetts. The Government relies on the Supreme Court's December 1990 decision in *Moskal v. United States*, —— U.S. ——, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990), which held that a "genuine" security containing false information is a "falsely made" security for purposes of 18 U.S.C. § 2314.

### Discussion

#### I. Second Circuit Law Prior to December 1990

Second Circuit cases decided prior to the Supreme Court's *Moskal* decision indicate that a "genuine" security containing false information—as opposed to, for example, a forged document—was not considered "falsely made" for purposes of 18 U.S.C. § 2314. In *United States v. Brown*, 246 F.2d 541 (2d Cir.1957), the defendant was convicted of the transportation of "falsely made securities" in foreign and interstate commerce in violation of 18 U.S.C. § 2314. The "securities" were four separate drafts, accompanied by supporting documents. The supporting documents included bills of lading and assayer's certificates that were forged, and genuine insurance certificates that included false information. The Second Circuit reversed the conviction and dismissed the indictment, in part on the grounds that "[t]he phrase 'falsely made' as used in the statute relates to the execution of ... a security rather than to whether its content be true or false." *Id.* at 542. The Court went on to state that "[m]anifestly, none of the drafts, taken by themselves, were [sic] falsely made within the meaning of the statute since they were just what they did on their face appear to be, genuine drafts executed by the actual drawer, the [defendant]." *Id.*

An earlier decision, *United States ex rel. Starr v. Mulligan*, 59 F.2d 200 (2d Cir. 1932), provides further support for the proposition that the Second Circuit did not consider a "genuine" security containing false information to be a "falsely made" security. *Mulligan* involved a statute with language very similar to 18 U.S.C. § 2314. Former 18 U.S.C. § 73 (now 18 U.S.C. § 495) provided in part that

> Whoever shall falsely make, alter, forge, or counterfeit ... any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving ... from the United States, or any of their officers or agents, any sum of money ... shall be fined ... and imprisoned.

The Court held that "[i]t has been authoritatively established" that this statutory provision "is limited to the false making, that is, the forging, of writings," and does not cover "writings genuine in execution but false in statements of fact they contain." *Id.* at 201.

■ In its brief on the instant motion, the Government has cited a subsequent district court decision, *United States v. Green*, 293 F.Supp. 999 (S.D.N.Y.1966), in which the Court (after a bench trial) found the defendant guilty under 18 U.S.C. § 2314. The Court concluded that the defendant's conduct—creating a fictitious personality and signing the name of that

personality on checks that he cashed—constituted forgery and was covered by 18 U.S.C. § 2314. The Court went on to state that:

> [E]ven assuming the activity herein did not amount to a forgery, it nonetheless did, in my opinion, constitute a false making, and since I do not subscribe to the view that forgery and false making are synonymous, nor to the view that they are to be read conjunctively, but rather disjunctively, I find that the statute was in any event violated.

*Id.* at 1003 (footnotes omitted). While this passage does contradict the Second Circuit's holding in *Brown*, it is not accurate for the Government to argue that *Brown* and *Mulligan* "have not been regarded as binding" in the Second Circuit. First, it is axiomatic that a district court cannot simply take a position contrary to that of its circuit court and regard the circuit court's interpretation of a given statute as not binding. Second, the *Green* decision does not refer to or otherwise cite either *Brown* or *Mulligan.* And, as Russotti has demonstrated (through diligent research), neither the Government's brief nor the defendant's brief in *Green* brought *Brown* or *Mulligan* to the attention of the district judge; it is therefore conceivable that the *Green* Court simply overlooked the Second Circuit precedent relating to the interpretation of "falsely made" in 18 U.S.C. § 2314.

In light of the Second Circuit's decisions in *Brown* and *Mulligan,* and notwithstanding the subsequent district court decision in *Green,* it is readily apparent that the Second Circuit's pre-*Moskal* interpretation of 18 U.S.C. § 2314 had been that a "genuine" security containing false information was not considered a "falsely made" security. The Second Circuit considered "falsely made" to refer to the execution of a document, rather than the falsity of the contents of the document.

## II. *The Supreme Court's* Moskal *Decision*

In *Moskal v. United States,* —— U.S. ——, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990), the defendant was indicted and convicted under 18 U.S.C. § 2314 for receiving two "washed" motor vehicle titles, which were "genuine" vehicle titles that incorporated false odometer readings.[2] On appeal to the Third Circuit, the defendant argued that the washed titles were "genuine" and thus not "falsely made," but the Third Circuit disagreed, and held that documents that are validly issued but contain material false information are "falsely made" for purposes of 18 U.S.C. § 2314. *United States v. Davis,* 888 F.2d 283, 285 (3d Cir.1989) (per curiam) (Lumbard, Cardamone & Mahoney, JJ., sitting by designation), *aff'd sub nom., Moskal v. United States,* —— U.S. ——, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990). The Third Circuit opinion recognized the split of authority that had developed on this issue, with some courts concluding that "falsely made" related to the genuineness of the document, and not the falsity of its contents, and other courts concluding that documents that were validly issued but contained false information were "falsely made" for purposes of 18 U.S.C. § 2314.[3] The Third Circuit opinion adopted the latter view and affirmed the conviction.

---

**2.** The "title washing" scheme in which the defendant participated involved several steps. The defendant's accomplices purchased used cars in Pennsylvania, rolled back the cars' odometers, and altered their titles to reflect the lower mileage figures. The altered titles were then sent to an accomplice in Virginia, who submitted them to Virginia authorities; the state officials in Virginia, unaware of the alterations, issued "genuine" Virginia titles incorporating the false mileage figures. *Moskal,* 111 S.Ct. at 463–64.

**3.** *Compare, e.g., United States v. Sparrow,* 635 F.2d 794, 796 (10th Cir.1980) (en banc) (where the security "itself was precisely what it purport-

ed to be" and "[o]nly the facts underlying the document were false," there could be no violation of 18 U.S.C. § 2314), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 209 (1981) *with, e.g., United States v. Cotoia,* 785 F.2d 497, 502 (4th Cir.1986) ("documents validly issued containing material false information are still 'falsely made' for the purposes of 18 U.S.C. § 2314"); *United States v. Daly,* 716 F.2d 1499, 1509 (9th Cir.1983) (" 'the purpose of the term "falsely made" was to ... prohibit the fraudulent introduction into commerce of falsely made documents *regardless of the precise method* by which the introducer or his confederates effected their lack of authenticity' ") (quoting *United States v. Mitchell,* 588 F.2d 481, 484 (5th Cir.)

The Supreme Court granted certiorari, and affirmed the Third Circuit decision. The Supreme Court held that a security that is "genuine"—*i.e.,* is precisely what it purports to be—but contains false information is a "falsely made" security for purposes of 18 U.S.C. § 2314. The Court first rejected the defendant's argument that because it is *possible* to interpret the phrase "falsely made, forged, altered, or counterfeited securities" to apply only to forged or counterfeited securities, the rule of lenity should have resolved the issue in his favor. The Court stated that, based on the language and structure, legislative history, and motivating policies of the statute, 18 U.S.C. § 2314 unambiguously applied to the defendant's conduct. *Moskal,* 111 S.Ct. at 465. The Court also stated that to exclude from the scope of 18 U.S.C. § 2314 any security that was genuine would essentially equate "falsely made" with "forged" or "counterfeited," thus violating the established principle that "a court should ' "give effect, if possible, to every clause and every word of a statute." ' " *Id.* at 466 (quoting *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152, 27 L.Ed. 431 (1883))).

The Court then addressed the defendant's argument that when " 'a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning.' " *Id.,* 111 S.Ct. at 468 (quoting *United States v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430 (1957)). The defendant had argued that, at the time Congress enacted the relevant clause of 18 U.S.C. § 2314, the term "falsely made" had an established common-law meaning equivalent to forgery, so that " 'falsely made' excluded authentic or genuine documents that were merely false in content." *Id.* The Court rejected this argument. The Court first found that the view that "falsely made" excluded documents "genuinely" issued by the person purporting to make them and

(emphasis in original), *cert. denied,* 442 U.S.

false only in content was not universal; and, because

no fixed usage existed at common law, [the Court thought] it more appropriate to inquire which of the common-law readings of the term best accords with the overall purposes of the statute rather than simply assume, for example, that Congress adopted the reading that was followed by the largest number of common-law courts.

*Id.,* 111 S.Ct. at 468–70. The Court went on to conclude that "[t]he position of those common law courts that defined 'falsely made' to exclude documents that are false only in content does not accord with Congress' broad purpose in enacting § 2314— namely, to criminalize trafficking in fraudulent securities that exploits interstate commerce." *Id.* at 470.

Justice Scalia, joined by Justices O'Connor and Kennedy, issued a vigorous dissent. Justice Scalia first examined the language of 18 U.S.C. § 2314, and concluded that the majority's interpretation of "falsely made" conflicted with the ordinary meaning of those words, in that "falsely made" should be understood to refer to the manner of making and not the contents of the document that was made. *Id.* at 471 (Scalia, J., dissenting). Justice Scalia also examined the common-law meaning of "falsely made," and concluded that the overwhelming consensus of common-law courts, state legislatures, and commentators that had used the term "falsely made" before Congress enacted the relevant clause of 18 U.S.C. § 2314 was that the term "falsely made" was synonymous with forgery or described an essential element of the crime of forgery, but did not refer to falsity of content.

Justice Scalia also argued that, for two decades after the passage of the relevant statutory language in 18 U.S.C. § 2314, lower federal courts uniformly rejected the position that a "genuine" document could be "falsely made" because it contained false information, and these cases were subsequently endorsed by the Supreme Court in *Gilbert v. United States,* 370 U.S.

940, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979)).

650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962), a case involving a statute very similar to 18 U.S.C. § 2314. *Id.*, 111 S.Ct. at 474. Justice Scalia stated that "[t]he whole rationale of the *Gilbert* decision ... was that inserting fraudulent content [into a security] could not constitute 'forgery' because 'forgery' requires 'false making.' It is utterly incompatible with that rationale to hold, as the Court does today, that inserting fraudulent content *constitutes* 'false making.'" *Id.*, 111 S.Ct. at 475 (emphasis in original).

### III. *Retroactivity Analysis*

The United States Constitution prohibits Congress and the state legislatures from enacting *ex post facto* laws. *See* U.S. Const. Art. I, § 9, cl. 3 and Art. I, § 10, cl. 1. A judicial decision that has the same effect as an *ex post facto* law violates the Due Process Clause of the Fifth Amendment or the Fourteenth Amendment. As the Supreme Court has explained:

> The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. But the principle on which the Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.

*Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977) (citations omitted); *see also Bouie v. City of Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) ("[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law.... If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."); *id.* at 354–55, 84 S.Ct. at 1703 (When an "unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime.").

The issue to be resolved in the instant motion is whether Russotti had fair warning that his conduct involving the $837.30 check could subject him to criminal liability under 18 U.S.C. § 2314. Russotti argues that the *Moskal* decision effected an unforeseeable expansion in the interpretation of 18 U.S.C. § 2314, at least with respect to the law within the Second Circuit, and that applying *Moskal* retroactively to conduct that took place before December 1990 violates his Fifth Amendment right to due process of law because he did not have fair warning that his conduct could give rise to criminal penalties under 18 U.S.C. § 2314. The Government counters that it was reasonably foreseeable that the Supreme Court would address the issue posed by *Moskal* and decide the question adversely to Russotti, so that Russotti's right to due process of law is not violated by the retroactive application of *Moskal* to his pre-December 1990 conduct.

In *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), the defendant was indicted for making false statements to the Federal Bureau of Investigation (the "FBI") and the United States Secret Service, in violation of 18 U.S.C. § 1001, which makes it a crime knowingly and willfully to make a false statement "in any matter within the jurisdiction of any department or agency of the United States." The district court had granted the defendant's motion to dismiss the indictment on the grounds that the investigations at issue were not matters "within the jurisdiction" of the respective agencies, as that term is used in § 1001. The Eighth Circuit affirmed, relying on a prior Eighth Circuit decision, *Friedman v. United States*, 374 F.2d 363 (1967), in which the Eighth Circuit held that the phrase "within the jurisdiction" referred only to "the power to make final or binding determinations." Two other circuits had expressly rejected the reasoning of *Friedman* and interpreted 18 U.S.C. § 1001 more broadly; the Supreme Court granted certiorari to resolve the conflict.

Then–Justice Rehnquist, writing for a unanimous Court, analyzed the statute, rejected the Eighth Circuit's interpretation of 18 U.S.C. § 1001 as too narrow, and held that the language of 18 U.S.C. § 1001 clearly encompassed criminal investigations conducted by the FBI and the Secret Service. The Court therefore reversed the Eighth Circuit's decision and remanded the case for further proceedings. The Supreme Court expressly rejected two arguments advanced by the defendant—one based on the rule of lenity and the other based on the rule against retroactive application of a judicial expansion of a criminal statute—against application of the broader construction of 18 U.S.C. § 1001 to him:

> Finally, respondent urges that the rule of lenity in construing criminal statutes should be applied to § 1001, and that because the *Friedman* case has been on the books in the Eighth Circuit for a number of years a contrary decision by this Court should not be applied retroactively to him. The rule of lenity is of course a well-recognized principle of statutory construction, but the critical statutory language of § 1001 is not sufficiently ambiguous, in our view, to permit the rule to be controlling here. And any argument by respondent against retroactive application to him of our present decision, even if he could establish reliance upon the earlier *Friedman* decision, would be unavailing since the existence of conflicting cases from other Courts of Appeals made review of that issue by this Court and decision against the position of the respondent reasonably foreseeable.

*Rodgers*, 466 U.S. at 484, 104 S.Ct. at 1948–49. The Supreme Court held unmistakably that a split of authority among the circuit courts of appeals on a given issue makes it "reasonably foreseeable" that the Court would review the issue and render a decision adverse to the defendant. In such an instance, the Court's decision may be applied retroactively to the defendant without violating the defendant's right to due process of law.

■ *Rodgers* controls the instant motion. Prior to the Supreme Court's *Moskal* decision, there was a split of authority among the circuit courts of appeals regarding the interpretation of 18 U.S.C. § 2314. Some circuits had held that a "genuine" security containing false information did not fall within the statutory phrase "falsely made, forged, altered, or counterfeited securities," while other courts of appeals had held that such a security was a "falsely made" security. Under *Rodgers*, it was "reasonably foreseeable" that the Supreme Court would review the issue and render a decision adopting the broader interpretation of 18 U.S.C. § 2314. The Supreme Court's grant of certiorari in *Moskal* on March 19, 1990, *see* 494 U.S. 1026, 110 S.Ct. 1469, 108 L.Ed.2d 607 (1990)—*before* Russotti caused his former employer to issue the $837.30 check—especially made it "reasonably foreseeable" that the Supreme Court would resolve the circuit split and issue a decision adverse to Russotti.[4]

Russotti has attempted to distinguish *Rodgers* on a number of grounds, but none is sufficient to justify a departure from the *Rodgers* holding. Russotti notes that, in *Rodgers*, only one circuit court of appeals had decided the issue in accord with the defendant's position, whereas in *Moskal*, the Court interpreted 18 U.S.C. § 2314 in a manner that was inconsistent with a number of courts of appeals that had addressed

---

**4.** Although Russotti has not made any showing that he actually relied on the Second Circuit's pre-*Moskal* precedent relating to 18 U.S.C. § 2314, *Bouie* suggests that a defendant need not demonstrate such actual reliance when asserting a retroactivity challenge on the ground that a criminal statute did not provide fair warning that the defendant's conduct would fall within the statute's prohibitions. *See Bouie*, 378 U.S. at 355 n. 5, 84 S.Ct. at 1703 n. 5. Even if Russotti had demonstrated such actual reliance, however, his retroactivity challenge would still fail, because his reliance would not have been reasonable. Cases contrary to the Second Circuit's pre-*Moskal* interpretation of 18 U.S.C. § 2314 existed, and the Supreme Court had granted certiorari in *Moskal* months before Russotti caused his former employer to issue the $837.30 check. Under *Rodgers*, 466 U.S. at 484, 104 S.Ct. at 1948, it was "reasonably foreseeable" that the Supreme Court would resolve the circuit split and decide the issue adversely to Russotti, so that any actual reliance on the pre-*Moskal* Second Circuit cases would have been unreasonable.

the issue. Russotti therefore argues that even if the defendant in *Rodgers* should have foreseen that the Supreme Court would address the issue and decide it adversely to him, it was not "reasonably foreseeable" that the Court in *Moskal* would issue a decision interpreting 18 U.S.C. § 2314 more broadly than a number of circuit courts of appeals that had considered the issue. This argument is not persuasive. The *Rodgers* Court did not attach any significance to the fact that only one court of appeals, the Eighth Circuit, had previously adopted the statutory interpretation advanced by the defendant; the Court simply held that the existence of conflicting cases from other courts of appeals sufficed to make it "reasonably foreseeable" that the Supreme Court would resolve the circuit split and render a decision in accord with the other circuit courts of appeals. Furthermore, regardless of the alignment of the circuit courts of appeals prior to the *Moskal* decision, the Supreme Court had granted certiorari in *Moskal* in March 1990; this especially made it "reasonably foreseeable" that the Supreme Court would resolve the circuit split and decide the issue adversely to Russotti.

Russotti also examines the substance of the arguments advanced by both the majority and dissenting opinions in *Moskal*, and contends that because Justice Scalia's dissent attracted two other votes and made a number of strong arguments against the result reached by the majority, it was not "reasonably foreseeable" that a majority of the Supreme Court would reach the decision that it did. The merits of the conflicting interpretations reached by the courts of appeals (or of the decision ultimately reached by the Supreme Court) are, however, not relevant to the *Rodgers* analysis; *Rodgers* simply holds that, where there is a split of authority among the circuit courts of appeals, it is "reasonably foreseeable" that the Supreme Court will resolve the circuit split in favor of one interpretation or the other. When one or more circuits have held that a criminal statute covers certain conduct, an individual cannot claim lack of fair warning that the Supreme Court would ultimately adopt that interpretation, even if one or more other circuit courts had construed the statute more narrowly.

Lastly, Russotti focuses on Justice Scalia's argument that the *Moskal* decision was "utterly incompatible" with a previous Supreme Court decision, *Gilbert v. United States*, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962). Russotti contends that because the result that the *Moskal* majority reached is not consistent with one of the Supreme Court's own precedents, it was not "reasonably foreseeable." As noted above, the *Rodgers* holding does not contemplate an examination of the merits of the conflicting positions of the respective courts of appeals or of the decision ultimately reached by the Supreme Court. Under *Rodgers,* the mere existence of conflicting decisions reached by other courts of appeals makes it "reasonably foreseeable" that the Supreme Court will resolve the circuit split and decide the issue adversely to the defendant, even if the defendant's preferred interpretation of the statute in question is consistent with a Supreme Court precedent. Moreover, the Supreme Court has never considered itself absolutely bound by its own precedents, and will depart from them when such a departure is warranted. *Cf. Payne v. Tennessee,* —— U.S. ——, 111 S.Ct. 2597, 2609–11, 115 L.Ed.2d 720 (1991) (noting the limits of the doctrine of stare decisis and the willingness of the Supreme Court to overrule its own precedents when appropriate). Therefore, even if it is accurate to conclude that the *Moskal* interpretation of "falsely made" within 18 U.S.C. § 2314 is "utterly incompatible" with the rationale of the *Gilbert* decision, it was no less "reasonably foreseeable" under *Rodgers* for the Supreme Court to have reached the decision that it did in *Moskal.*

### Conclusion

For the reasons stated above, Russotti's motion to dismiss the Information is denied.

SO ORDERED.